## In re WELLINGTON RESOURCES CORPORATION, Debtor.

## In re WHITEHALL MINING COMPANY, INC., Debtor.

### Bankruptcy Nos. 382–00016–F, 382–00017–F.

United States Bankruptcy Court,
N. D. Texas,
Dallas Division.

Sept. 28, 1982.

Philip I. Palmer, Jr., Dallas, Tex., Robert Yaquinto, Trustee, Dallas, Tex., for Wellington Resources Corp.

Jeffery Hart, Asst. Atty. Gen., Austin, Tex., for State of Tex.

## MEMORANDUM OPINION

JOHN C. FORD, Bankruptcy Judge.

On August 24, 1982, a hearing was held in the Bankruptcy Court to determine whether assets were fraudulently acquired by the Debtors prior to the commencement of these proceedings. If assets were acquired by fraud, then a trust ex maleficio in the nature of a constructive or involuntary trust would take those assets out of the Court. Assuming the cestui que trust could successfully identify and trace the fraudulently acquired assets, then the Court would be obligated to release the assets to the rightful equitable owners. In the case at bar, it is the finding of this Court that the subject assets were not acquired by fraud. The following Findings of Fact and Conclusions of Law are presented in accordance with Bankruptcy Rule 752.

## FINDINGS OF FACT

A. *Procedural History of These Proceedings.*

This proceeding is just one in a number of complicated controversies arising out of the Chapter 11 cases filed by the Debtors on January 5, 1982. A previous decision in this case, styled *In re Wellington Resources Corporation, et al. v. State of Texas,* 20 B.R. 64 (Bkrtcy., N.D.Tex.1982), contains detailed background information about the Debtors which will be incorporated into this opinion.

The State of Texas brought an Application to Release Funds alleging that the Debtors, Wellington Resources Corporation ("Wellington"), and Whitehall Mining Co., Inc. ("Whitehall"), acquired funds of investors by fraudulent means. Specifically, the State of Texas alleges that the gold mining investment program conducted by the Debtors until shortly before these proceedings were commenced, was a fraudulent scheme to lure money out of the pockets of innocent investors by willful misrepresentation and other illegal means. The State alleges also that the failure of the Debtors to register the investment program with the State Securities Board constituted, along with the failure of the Debtors' salesmen to register as security salesmen, a violation of the State Securities law. The State further contends that findings of fraud by this Court will take the assets in question out of the jurisdiction of the Bankruptcy Court for disposition elsewhere.

The instant controversy was brought before the Court on the First Amended Application to Release Property filed by the State of Texas. Paragraphs five and six of the State's amended application recite that the determination of fraud is to be made under Texas law. In addition, the State says that under the Bankruptcy Code, the existence of a constructive trust, or trust ex maleficio, is determined according to Texas law. The Court agrees and finds that the State's pleadings require an evidentiary hearing as to allegations of fraud to be made by this Court pursuant to Texas law. At the hearing on August 24, 1982, after announcing ready, the State of Texas contended that the only question before the Court was a question of law. The Court disagrees. The State must be held to the

pleadings filed with the Court. Those pleadings are clear and unequivocable as to the necessity for a evidentiary hearing to determine the allegations of fraud. As soon as the Court made known its intention to proceed with the evidentiary hearing, the State of Texas withdrew its announcement of ready. After reciting into the record the facts leading up to the August 24th hearing, I then proceeded to allow the Debtors to put on testimony. I took this step despite the withdrawn announcement of ready because the State of Texas had several months in which to prepare for the hearing in this case. The pleadings in this case are clear as well as the fact that the State of Texas had ample opportunity to prepare and present its case. Moreover, on August 11, 1982, I had held a hearing to determine the State's Motion to Stay the August 24, 1982 hearing and decided to deny the requested relief. I then gave the State of Texas leave to file a Notice of Appeal of the interlocutory order, which was heard and decided by the District Court on August 13, 1982. In deciding to allow the August 24 hearing to proceed and to deny the State's Application for leave to Appeal, the District Court stated that "the State has made no showing that any harm will result from allowing the August 24 hearing to proceed as scheduled." The Debtors presented five witnesses and introduced twenty exhibits into the record at the August 24 hearing. The State of Texas was provided ample opportunity to cross-examine the witnesses and did so.

B. *The Wellington/Whitehall Investment Program.*

According to testimony by Arthur Espy, President of Wellington, the premise behind the Wellington/Whitehall program is to reopen mines which had been closed around the turn of the century. Espy, who is president of Wellington, proposed the idea that when gold was selling for twenty dollars an ounce it was not profitable to operate mines that required complicated or expensive extraction processes to recover mineral ore. However, with gold selling today for well above the four hundred dollar mark per ounce it was thought that played-out mines could be reworked to provide a sizeable return on investment.

At the hearing, evidence was presented that the Debtors were organized in the Spring or early Summer of 1981 by Mr. Espy and Mr. Thomas. On two separate occasions, Espy and Thomas put into the business money aggregating a total of $30,-000.00 each in order to start up the business. Both Espy and Thomas had been associated with a similar mining operation known as Omni which had operated in several states including New Mexico. Although the record is somewhat vague on this point, it appears that Omni was shut down by the New Mexico State Securities Commission for various violations of the New Mexico securities laws. Wishing to avoid similar problems in Texas, Espy and Thomas approached the Dallas law firm of Baker, Miller, Phillips & Murray to discuss their proposed plans to offer the Wellington/Whitehall investment program. For a sizeable fee in excess of ($200,000.00) Two Hundred Thousand Dollars, Baker, Miller proceeded to draft and finalize a brochure entitled "Ore Mining for the Miner" and provide letter opinions concerning various tax, securities and legal questions about the program. At this same time, the Debtors contracted with an economic analyst for the preparation of an economic study of mining and also prepared a list of contractors and suppliers of mining operations in the Southwestern United States. In addition to the aforesaid preparations, the Debtors retained the national accounting firm of Alexander & Grant to handle the accounting procedures of the Debtors.

Office space was obtained in Campbell Center in Dallas whereupon Espy and Thomas began to hire employees. John Sandy, who has a masters in geology was hired to investigate potential mining sites and to estimate the profitability of development of those sites. Mr. MacGregor was hired to help in the investigation of mining sites and brought to the operation over twenty years of work experience managing mines. Dr. Kovassar, who possesses a Ph.D

in economics, was hired to study the economies of developing mining operations in what had been marginal mines.

Soon after having opened the Campbell Center offices, the Debtors purchased a LHD Mining Machine, and a large number of four-wheel drive vehicles for overland travel to the several proposed mining sites. Testimony presented at trial established that One Hundred Fifty-nine Thousand Dollars ($159,000.00) was spent purchasing the aforementioned pieces of equipment. In line with the Debtors testimony that they were interested in acquiring old leases for reworking, the Debtors spent Sixty Thousand Dollars ($60,000.00) to purchase option leases on old mining sites in New Mexico, Colorado, Arizona, Nevada, and California. The Debtors also expended appreciable sums of money on acquiring a sophisticated computer system and other office equipment.

The money used to purchase the various enumerated items came out of investor funds. The Debtors had been quite successful in raising significant sums of investor money and had accumulated over 1.14 million dollars in cash by the time these proceedings were commenced. An additional sum of five million dollars was raised in promissory notes which the Debtors were hoping to discount with U.S.J.I.G. at the time these reorganization proceedings were commenced. Although Two Hundred Twenty Three Thousand Dollars ($223,-000.00) was paid in fees to sales agents of the Debtors, this amount was only 4% of the total of six million in cash and notes raised by the salesmen.

The Court attached great weight to the testimony of Mr. Richard Holmes, a C.P.A. who has had much experience investigating the financial affairs of numerous debtors who have appeared before this Court. Mr. Holmes is a highly respected accountant who was engaged by the Debtors to examine the financial records of the Debtors and to determine if any financial wrongdoing or defalcation could be discovered from the books of the Debtors. Mr. Holmes reported that he had undertaken a complete examination of the Debtors' books and records, and he could not find any evidence of misappropriation of monies. Moreover, Mr. Holmes indicated that all the money reported to have been raised from investors was accounted for and used in the way indicated in the Debtors' books. In addition, Mr. Holmes reported that books and records were kept separately for Wellington and Whitehall, including records of all receipts and disbursements.

The Court was also impressed with the testimony of Mr. O'Neil. Mr. O'Neil is an investor in the Wellington/Whitehall program who has no connection with the Debtors other than his investment with them. Mr. O'Neil is a computer specialist who appeared to be a quite intelligent and sophisticated person. Mr. O'Neil has actively followed developments in the Wellington/Whitehall case and has volunteered to serve on the creditors' committee established in these proceedings. Mr. O'Neil testified that he purchased a share in the program sometime in August 1981. He apparently spent some time prior to actually investing his money inquiring into the legitimacy and the financial implications of investing in the Wellington/Whitehall program. He has attended the section 341 creditors meeting in these proceedings, he has talked with Mr. Hart, the Assistant Attorney General handling the State's securities violations case, and he has attended most of the Court hearings to date. He testified that to this day he does not feel lied to or misled by anyone in making this investment. Moreover, Mr. O'Neil would like to proceed with the mining program as originally planned because he still feels there is a chance that significant quantities of ore will be produced.

As can be inferred from reviewing the evidence presented at trial, the Wellington/Whitehall investment program is somewhat unique. What distinguishes the Wellington/Whitehall program from deceptive schemes to invest in non-existent gold mines is the apparently serious effort on the part of the organizers of the Debtors to lay the framework for a legitimate busi-

ness. Sufficient credible evidence was presented at trial to show that the Debtors were attempting to present a legitimate business enterprise to potential investors. The attempt to present a legitimate business opportunity does not excuse the failure of the Debtors to register their offering according to State regulatory requirements. What is at issue here is the question whether the Debtors committed common law fraud in offering this investment opportunity to investors. The evidence presented at trial does not support such a finding.

The August 24th hearing reinforced the Court's opinion that Mr. Espy and Mr. Thomas have embarked on this gold mining venture in a businesslike manner. It is no surprise to the Court, after having reviewed Mr. Espy's credentials including an M.B.A., and more than twenty years experience as a businessman and a stockbroker that he and Mr. Thomas sought the advice of legal and accounting professionals prior to embarking on this program. The premise of reworking old gold mines is, in the eyes of the Court, analogous to today's practice of reworking old oil wells that were capped when the price of oil was only two dollars a barrel instead of today's price of thirty-five dollars a barrel. Although the Debtors may have violated securities regulations in making the offering in the manner in which it was made, those violations are not fraud. This Court does not find the Debtors, or the officers of the Debtors guilty of any fraud. Therefore, the Court finds that all property, other than property which was recognized by the Debtors as held in trust at the time they filed their petitions herein, is vested with both legal and equitable title in the Debtors.

### CONCLUSIONS OF LAW

At the time a Chapter 11 petition is filed with the Bankruptcy Court, a bankruptcy estate is created comprising all real, personal and intangible property in which the Debtor has either a legal or equitable interest, or both. See 11 U.S.C. § 541. The Debtor's interest in an item of property will be determined by nonbankruptcy law. In the case at bar, the laws of the State of Texas as to the Debtors' legal and/or equitable title to property will be applied.

At the time the petitions were filed in these proceedings, the Debtors had legal title to the funds in question. The question left to be determined is whether the debtor participated in some wrongdoing that would create a trust ex maleficio for the victims of the Debtors' allegedly wrongful acts. The State of Texas alleges that the property held in legal title by the Debtors was fraudulently obtained. The proper test to apply as to whether there is fraud is the common-law test of fraud. Common-law fraud is usually defined as requiring material misrepresentations made in bad faith which were relied upon to the detriment of the tort victim. In the case of *Rio Grande Oil v. State of Texas,* 539 S.W.2d 917 (Civ.App.Hou.1976), Judge Peden states:

> "that articles 581–4F and 581–32 (of the Texas Blue Sky Laws) extend the definition of common-law fraud to the practices enumerated in them and that reliance is not a necessary element of them."

Although Judge Peden may have been referring only to proceedings involving temporary injunctions of securities law violators, it may be appropriate to apply a test in the case at bar requiring proof only of material misrepresentations made in bad faith causing damages. I find that based upon the evidence presented in this case that the Debtors have not made material misrepresentations to the potential investors in the program described herein. The brochure distributed by the Debtors is not unlike those distributed in registered securities offerings. It contains information warning of the speculative nature of the investment and also warns the investor of the possibility that the tax benefits of the investment program may never be realized by the investor. The evidence as to the significant amount of time spent exploring mining sites and purchasing equipment was indicative of the good faith of the Debtors and their officers in offering this program. It should be mentioned that the Court had

an opportunity to examine the demeanor of the witnesses and was impressed with their candidness and apparent sincerity.